UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER   10-0024 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| RILEY D. DANTZLER | * | MAG. JUDGE KAREN L. HAYES |

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 17] filed by defendant, Riley D. Dantzler.  For reasons stated below, it is recommended that the motion be **DENIED.**

On December 11, 2009, Trooper John Peters of the Louisiana State Police (sometimes referred to as "Peters"), acting in concert with information received from fellow law enforcement officers, stopped Riley D. Dantzler ("Dantzler") for a traffic infraction on Interstate 20 in Ouachita Parish, Louisiana.  Pursuant to the stop, the Louisiana State Police uncovered various quantities of cocaine located inside of Dantzler's sports utility vehicle ("SUV").  On January 28, 2010, a federal grand jury returned a four count indictment against Dantzler for his alleged knowing and intentional possession with intent to distribute cocaine base and cocaine powder, possession of a firearm during a drug trafficking crime, and forfeiture.  21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii), 18 U.S.C. §§ 924(c)(1) and (d)(1).  On March 31, 2010, Dantzler, via counsel, filed the instant motion to suppress all evidence that was seized as a result of the stop and search of his vehicle.  Following delays for briefing and an evidentiary hearing that was held on April

26, 2010, the matter is now before the court.[1]

### Background

In the fall of 2009, Riley D. Dantzler came to the attention of area law enforcement agencies (the Louisiana State Police, the Morehouse Parish Sheriff's Office ("MPSO"), and the FBI Task Force) during their investigation of narcotics distribution activities in Morehouse Parish, Louisiana. (Hearing Transcript ("Tr.") pgs. 28-29). Specifically, the investigation uncovered that Riley D. Dantzler of Houston, Texas was the supply source for crack cocaine, powder cocaine, and marijuana for the Bastrop area. *See* report by Trooper Shelton Crooke, Exh. 4-D [doc. # 28].

During the investigation, the MPSO learned from a confidential informant that Dantzler would be delivering five to ten kilograms of cocaine to Morehouse Parish. (Motion and Order, Exh. 1-D). The investigation also revealed that on December 3, 2009, Dantzler had rented a 2009 Chevrolet Tahoe bearing Texas License STY440 and VIN 1GNEC23X9R232443 from Enterprise Leasing of Houston, Texas. *Id*. The 2009 Tahoe was equipped with the OnStar Global Positioning System that also was serviced by OnStar, with an account in the name of Enterprise Leasing of Houston, Texas. *Id*.

Because of the need to track the vehicle, the District Attorney for the 4th Judicial District incorporated the foregoing facts into a motion that he submitted to the 4th Judicial District Court for the Parish of Morehouse to obtain an order compelling OnStar or General Motors ("GM") to help the MPSO track the 2009 Tahoe. ("Motion and Order," Exh. 1-D). On December 10, 2009,

---

[1] At the hearing, the court granted defendant's request to file a supplemental memorandum within 15 days after receipt of the hearing transcript.

Deputy Chris Balsamo of the MPSO confirmed the veracity of the facts set forth in the motion, via an affidavit sworn to and subscribed before the Honorable Scott Leehy of the 4th Judicial District Court. (Affidavit, Exh. 2-D). That same day, Judge Leehy issued an order that, among other things, required OnStar to furnish the MPSO with information, facilities, and technical assistance necessary to monitor the 2009 Tahoe rented by Riley Dantzler. (Order, Exh. 3-D). There is no evidence that OnStar challenged the sufficiency of the order.

On December 11, 2009, at approximately 3:00 p.m., Deputy Balsamo contacted Trooper Shelton Crooks, and told him that, according to OnStar, Dantzler was en route to Louisiana from Houston, Texas. (Crooks Report, Exh. 4-D). Accordingly, Troopers Shelton Crooks and Chris Jordan traveled to Haughton, Louisiana (east of Shreveport), and at approximately 4:20 p.m., initiated surveillance for Dantzler at milepost 33 of Interstate 20, on the eastbound entrance ramp. *Id*. Some 50 minutes later, an OnStar representative contacted Trooper Crooks on his cell phone and helped him identify Dantzler's vehicle as it passed the troopers' location. (Crooks Report, Exh. 4-D).[2] Crooks thereupon entered the interstate, caught up to the Tahoe, and confirmed the vehicle's license plate number. (Tr. 32-33). With the assistance of Sergeants Neal Harwell and Cameron Douglas of the Monroe Field Office, Crooks maintained constant surveillance of Dantzler's vehicle as it continued eastbound on I-20. (Crooks Report, Exh. 4-D).

At approximately 5:30 p.m., Trooper Crooks contacted Trooper Peters[3] and advised him that Dantzler was eastbound on I-20, and possibly transporting a large amount of cocaine. *Id*.

---

[2] Crooks observed the black 2009 Tahoe as it passed him. (Tr. 32-33).

[3] Peters is a 16 year veteran with the Louisiana State Police. (Tr. 5-6). Over the years, he has been involved in at least 150 felony cases, and had received extensive training. *Id*.

Crooks instructed Peters to establish probable cause to initiate a traffic stop of Dantzler's vehicle. *Id*., Tr. 15. At around 6:00 p.m., Trooper Peters and his K-9 partner, took up station at Exit 101 on I-20, near Calhoun, Louisiana. (Tr. 7-8). Peters monitored the radio as the Tahoe approached his location. *Id*.[4] Once the Tahoe passed him, Peters merged onto the interstate and worked his way through traffic to catch up to the Tahoe. *Id*. He eventually reached within one vehicle of the Tahoe, at which point he observed the Tahoe's driver-side tires cross the yellow line that separates the travel lane from the median. (Tr. 8).[5] Peters engaged his unit's video camera so he could record any other violations. (Tr. 8-9). He then overtook the intervening vehicle and again observed the Tahoe pass over the yellow line on the median side of the roadway. *Id*. At that point, Peters initiated a traffic stop of the Tahoe. *Id*. The time was approximately 6:15 p.m., and it was already dark outside. (Tr. 16).

Trooper Peters walked to the driver's side window, and asked the driver to exit the vehicle. (Tr. 10). Peters obtained the driver's operator license, and confirmed that he was Riley Dantzler. *Id*. Peters identified himself to Dantzler, informed him about the reason for his stop, and explained that he was going to check his driving record. *Id*. He asked Dantzler if he had any outstanding warrants or arrests, and stated that if his driving record was clear, he probably would issue a verbal warning and Dantzler could be on his way. *Id*.

Peters returned to his unit and confirmed on the "NBT" that Dantzler had some previous

---

[4] Troopers Crooks and Jordan were tailing the Tahoe and radioed its location to Peters. (Tr. 16).

[5] Peters was able to observe this infraction, despite the presence of the intervening vehicle, because he had edged his unit to the left in an effort to induce the intervening vehicle to switch lanes. *See* Tr. 8-9.

narcotics arrests. (Tr. 10-11). However, his driving record came back clean. *Id*. Accordingly, Peters opted to issue a verbal warning, but also completed a written consent to search form. *Id*. Peters then returned to Dantzler, explained to him that he was going to issue a warning, and returned his driver's license. (Tr. 11-12). According to Peters, he then entered into a "consensual encounter." (Tr. 11-12). Peters asked Dantzler that given his prior arrest record, would he mind if he searched his vehicle. (Tr. 11-12). After a long pause, Dantzler replied, "Sir, I need to be honest with you . . . I've got some . . . XO's." (Tr. 12).[6] Dantzler then added that they were located in the vehicle's center console, and that he would be happy to retrieve them for Peters. *Id*. However, Peters informed Dantzler that he had just given him probable cause to search the vehicle because he was transporting ecstasy. (Tr. 12). Peters instructed Dantzler to stand in front of the police unit, while he searched the Tahoe. (Tr. 12-13).

      Peters's search quickly uncovered a ring box in the vehicle's center console. *See* Tr. 13. Inside the box was a small plastic bag, with various colored pills, which Peters associated with ecstasy. (Tr. 13). Peters continued to search the vehicle with the assistance of Trooper Jordan, who had since arrived on scene. *See* Tr. 13. As soon as the troopers opened the vehicle's rear hatchback, Trooper Peters smelled an odor that, from his training, he associated with cocaine. (Tr. 13-14). They also saw a nylon bag in the rear luggage compartment, which Trooper Jordan opened. (Tr. 13-14). Inside the nylon bag, he found a package of cocaine. (Tr. 14).[7] At that point, the troopers handcuffed Dantzler and formally placed him under arrest. (Tr. 14-15).

---

[6] Trooper Peters paraphrased Dantzler's response. *Id*. "XO's" is the street name for ecstasy. *Id*.

[7] The troopers later discovered a firearm in the bag. (Tr. 14).

## Law and Analysis

I. **The OnStar-Assisted Surveillance**

Defendant contends that the order issued by the 4th Judicial District Court to OnStar and/or GM exceeded the court's jurisdiction. He further argues that the affidavit submitted in support of the order was flawed because it did not mention attempts to verify the accuracy of the confidential informant's allegations.

In his supplemental memorandum, defendant exclusively argues that the evidence must be suppressed because the court order issued herein exceeded the jurisdictional boundaries of the issuing court under Louisiana law. *See Phillips Petroleum Co. v. OKC Ltd. Partnership*, 634 So.2d 1186 (La. 1994) (addressing the jurisdictional scope of a court's subpoena power in a civil case). Defendant's argument, however, overlooks that

> the proper inquiry in determining whether to exclude the evidence at issue is not whether the state officials' actions in arresting him were "lawful" or "valid under state law." The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution. This is so because, absent an exception, the exclusionary rule requires that evidence obtained in violation of the Fourth Amendment be suppressed. The exclusionary rule was created to discourage violations of the Fourth Amendment, not violations of state law

*United States v. Walker*, 960 F.2d 409, 415 (5th Cir. 1992) (citations omitted).

Accordingly, defendant's argument lacks merit.

Even when analyzed from the perspective of the Fourth Amendment, however, defendant's challenge proves unavailing because the receipt of satellite tracking information from a third-party monitoring service subscribed to by the vehicle owner does not constitute a "search" or "seizure" under the Fourth Amendment; therefore, defendant does not enjoy standing

6

to contest the efficacy of the court order.

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND. IV. The protections of the Fourth Amendment extend to the states via the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 2253-2254 (1979) (citation omitted). "Standing is a privacy or property interest in the premises searched or the items seized which is sufficient to justify a 'reasonable expectation of privacy' therein." *United States v. Judd*, 889 F.2d 1410, 1413 (5th Cir. 1989) (citations omitted). A "reasonable expectation of privacy" is established by proof of "(1) an 'actual, subjective expectation of privacy,' and (2) that the expectation is 'one which society would recognize as reasonable.'" *United States v. Setser*, 568 F.3d 482, 490-491 (5th Cir.) (citations omitted), *cert. denied by, Setser v. United States*, ___ U.S. ___, 130 S.Ct. 437 (2009). The second factor may be approached from various angles:

> whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

*Id*.

In the context of a motion to suppress, the defendant carries the burden of proving, by a preponderance of evidence, that the challenged evidence was obtained in violation of his Fourth Amendment rights. *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992) (citing inter alia, *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 133-34, 99 S.Ct. 421, 424 n. 1, 425, 58 L.Ed.2d 387 (1978)).

In this case, defendant fails to satisfy either prong of the "reasonable expectation of privacy" requirement. First, although defendant adduced evidence that he leased the 2009 Tahoe,[8] and thus enjoys some modicum of a possessory interest therein, he has not adduced any evidence that he subjectively believed that his real-time movements in the vehicle would remain free of monitoring – either visually or electronically, given the preexisting installation of the OnStar system in the vehicle. For instance, there is no evidence that Dantzler did not know that the GM-manufactured Tahoe was installed with the OnStar system. There also is no evidence that Dantzler's rental agreement with Enterprise or OnStar's subscription agreement with Enterprise, precluded monitoring of the vehicle's travels via GPS or disclosure of real-time monitoring data to third-parties, including law enforcement. Without such evidence, defendant has not met his Fourth Amendment burden. *See United States v. Krout*, 66 F.3d 1420, 1430-31 (5th Cir. 1995) (defendant lacked Fourth Amendment standing where he failed to introduce evidence of a sufficient possessory interest, despite having been alerted that he needed to establish "*his*" expectation of privacy in the premises searched).[9]

Second, defendant has not established that society is prepared to recognize that a driver should reasonably expect his vehicle's travels on a public thoroughfare to remain private when the vehicle is equipped with a GPS tracking system that is intended to be remotely accessed and

---

[8] "Motion and Order," Exh. 1-D.

[9] The court acknowledges that at the April 26 hearing in this matter, the government and the defense agreed that the OnStar question remained purely a legal issue. (Tr. 2-3). In fact, the government suggested that the OnStar issue did not require the "taking of any kind of evidence." *Id*. Given the parties' unanimity in this regard, the court so acquiesced. *See* Tr. 3. Even if the defense was unfairly lulled into complacency by the government's position at the hearing, that does not impair the outcome herein because defendant has not met his burden regarding the second prong of the "expectation of privacy" inquiry. *See* discussion, *infra*.

monitored by a third-party.

In 1983, the Supreme Court remarked that

> [a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [defendant] travelled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination . . .

*United States v. Knotts*, 460 U.S. 276, 281-282, 103 S.Ct. 1081, 1085 (1983).[10]

Furthermore, "[n]othing in the Fourth Amendment prohibit[s] the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afford[s] them . . ." *Id*. The Court concluded that the monitoring of beeper signals did not transgress any legitimate expectation of privacy by defendant; therefore, there was neither a "search" nor a "seizure" as contemplated by the Fourth Amendment. *Knotts, supra*.

In the wake of *Knotts*, the Fifth Circuit, sitting en banc, considered the Fourth Amendment implications of an electronic tracking device that authorities installed on an aircraft pursuant to a warrant, which the officers then neglected to remove within the time period specified by the warrant. *United States v. Butts*, 729 F.2d 1514 (5th Cir. 1984) (en banc). Three

---

[10] In *Knotts*, law enforcement agents placed a beeper or radio transmitter into a five gallon drum which enabled them to electronically monitor the container as it was transported to defendant's abode. *Knotts, supra*. The Court did not address the constitutional ramifications of the warrantless installation of the beeper because respondent conceded that he did not have standing to raise the issue. *Id*.

Dantzler argues that, in contrast to *Knotts*, law enforcement officers in this case did not merely use the GPS data to supplement their visual surveillance, they used the GPS data to actually identify Dantzler's vehicle. (Def. Suppl. Memo., pgs. 7-8). This purported distinction, however, proves ephemeral. While the agents in *Knotts* initially used the electronic surveillance to supplement their visual surveillance, they eventually lost visual contact with the vehicle and had to rely exclusively upon the beeper to reestablish the drum's location. *Knotts*, 460 U.S. at 277-279, 103 S.Ct. at 1083-1084.

days after the warrant expired, customs officials used the tracking device to monitor and intercept an aircraft. *Id.*[11] In his motion to suppress, the pilot of the airplane argued that the authorities' monitoring of the signal was tainted by their failure to timely remove the device as required by the warrant. *Id*.

> Applying *Knotts*, however, the court recognized that
>
> monitoring signals from an electronic tracking device that tells officers no more than that a specific aircraft is flying in the public airspace does not violate any reasonable expectation of privacy. Because this is so, no Fourth Amendment violation results from such public detection. The movement of an airplane in the sky, like that of an automobile on a highway, is not something in which a person can claim a reasonable expectation of privacy.

*Butts*, 729 F.2d at 1517.

The court acknowledged that *Knotts* left unanswered "not only the question of whether the police conduct that made the monitoring possible violated the Fourth Amendment, but also the question of how such conduct, if illegal, will be dealt with." *Id*. Nevertheless, the Fifth Circuit declined to apply the exclusionary rule because no Fourth Amendment right was infringed. *Id*. The court emphasized that "[t]he signal from the *then unwarranted beeper* did nothing more than enhance the customs official's legal right to observe the aircraft's public movements." *Id*. (emphasis added).

Furthermore, in the analogous context of subscriber information transmitted to internet service providers ("ISPs"), courts uniformly have held that subscribers do not enjoy a reasonable expectation of privacy with regard to the data transmitted to third-parties. *See e.g., United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth

---

[11] The agents also periodically monitored the aircraft by radar and by sight. *Id*.

Amendment's privacy expectation.") (citations omitted); *see also, United States v. Beckett*, 544 F. Supp. 2d 1346, 1350 (S. D. Fla. Mar. 12, 2008), *affirmed*, 2010 WL 776049 (11th Cir. Mar 09, 2010) (where the terms of ISP subscriber agreements specify that the ISP will cooperate with law enforcement, there can be no reasonable expectation of privacy, and thus, no Fourth Amendment protection for disclosure of subscriber information despite the lack of a warrant, court order or subpoena).[12]

Applying the foregoing considerations to the case at bar, it is manifest that Dantzler did not enjoy a reasonable expectation of privacy in the movement of his rented vehicle on public thoroughfares. The OnStar system revealed no more information than what law enforcement officers could have observed from constant surveillance of the vehicle from the time that it was rented in Houston until the time of the stop. Although defendant trumpets the fact that the court order was issued to a Michigan corporation, for a vehicle that was rented in Texas, there is no evidence that Louisiana law enforcement officials acted upon any information provided by OnStar until the vehicle approached the Louisiana border. It was not until the vehicle passed the officers' surveillance point in Louisiana that an OnStar representative actively assisted the state trooper to confirm that the vehicle had passed his vantage point. Moreover, this is not a case where authorities physically installed a tracking device on defendant's vehicle. Rather, the

---

[12] Similarly, in the commercial paper context, the Supreme Court has held that an account holder has no reasonable expectation of privacy under the Fourth Amendment sufficient to permit him to challenge subpoenas issued by authorities to his third-party bank to obtain records of his transactions with the bank. *United States v. Miller*, 425 U.S. 435, 438, 96 S.Ct. 1619, 1621 (1976); *see also United States v. Sahley*, 526 F.2d 913, 916 (5th Cir. 1976) (bank customer has no standing to challenge the validity of an agency subpoena directed to his bank for production of its transactions records with him).

officers merely accessed information that defendant's rented vehicle had transmitted to a third-party monitoring service.

Furthermore, Dantzler either knew or should have known that he was renting an OnStar-equipped vehicle that was capable of transmitting the vehicle's location to a monitoring service. As a result, defendant accepted the risk that the information that the tracking system transmitted to the third-party monitoring service could be forwarded to others. *See Smith v. Maryland* , 442 U.S. 735, 743-744, 99 S.Ct. 2577, 2582 (1979) (by using his telephone, petitioner conveyed information to the telephone company and assumed the risk that the information would be turned over to the police). Even if Dantzler was not aware that he was renting a vehicle outfitted with OnStar, he has not demonstrated that society expects the movements of a rental car to remain private. *See Smith, supra*.

In sum, defendant has failed to establish a reasonable expectation of privacy in the movements of his OnStar-equipped rental car as it traveled upon public thoroughfares, and thus, the authorities' solicitation and receipt of tracking information from a third-party monitoring service subscribed to by the vehicle owner did not constitute a "search" or "seizure" under the Fourth Amendment. As a result, defendant lacks standing to challenge the vitality of the court order compelling OnStar to disclose the vehicle's location to law enforcement officers. *See United States v. Gbemisola*, 225 F.3d 753 (D.C. Cir. 2000) (because no warrant was required for either the installation or use of the mobile tracking device, the resulting evidence was admissible regardless of the validity of the warrant); *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007) (warrantless installation of tracking device on vehicle did not violate the Fourth Amendment);*United States v. Moran*, 349 F. Supp.2d 425, 467-468 (N. D. N.Y.2005)

(warrantless installation of tracking device on vehicle did not constitute a search or seizure as contemplated by the Fourth Amendment).[13]

**II.    The Stop and Detention**

Defendant further contends that the evidence obtained by the state police should be suppressed because his vehicle was stopped without probable cause, and he was detained without reasonable suspicion to believe that he was engaged in criminal activity.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks omitted).  A traffic stop entails a seizure for purposes of the Fourth Amendment.  *Id.*; *see also, United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupant(s) constitutes a seizure).  Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops.  *Brigham, supra.*  (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime."  *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392

---

[13] In addition to the Fourth and Fourteenth Amendments, defendant's motion invoked, in passing, the Fifth, Sixth, and Eighth Amendments. (M/Suppress, pg. 1). Defendant, however, fails to advance any argument premised upon these constitutional protections. Thus, they are deemed abandoned. Nevertheless, the court pauses to add that "a party incriminated by evidence produced by a third party sustains no violation of his own Fifth Amendment rights." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 55, 94 S.Ct. 1494, 1514 (1974) (citation omitted). Furthermore, the Sixth Amendment right to confront witnesses does not apply to physical evidence. *United States v. Herndon*, 536 F.2d 1027, 1029 (5th Cir. 1976).

U.S. 1, 30, 88 S.Ct. 1868 (1968)). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

      a)     <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is

about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Where, as here, the officer had an ulterior motive for the stop,[14] such motive does not render the stop unconstitutional. *See United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003) ("the constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.").

In this case, Trooper Peters observed the driver-side tires of Dantzler's vehicle traverse the yellow or "fog" line that separates the travel lane from the median – not once, but twice. (Tr. 8, 19-21). Having observed and listened to Trooper Peters at the hearing, the court finds his testimony to have been earnest, persuasive, and entirely credible. *Contrast United States v. Cole*, 444 F.3d 688 (5th Cir. 2006) (district court failed to determine whether defendant actually committed a traffic infraction, when officer's testimony was contradicted by defendant).[15] In Louisiana, a vehicle that partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right hand shoulder of the road provides probable cause to believe that a traffic violation for improper lane use has occurred. *State v. Waters*, 780 So.2d

---

[14] Trooper Peters admitted that this was a pretext stop, and that he was looking for a traffic violation to support the stop. *See* Tr. 19.

[15] Despite some initial equivocation, *see* Tr. 18, Trooper Peters clarified that it was *not* reasonable for a driver to stray across the yellow fog line. *See* Tr. 19.
Defendant seems to suggest that the court should adopt some form of an adverse inference because of Trooper Peters' failure to produce the videotape of the traffic stop at the hearing. When questioned, however, Trooper Peters explained that he did not bring the videotape because he thought "they would have already had it." (Tr. 21). Moreover, from the government's perspective, the videotape is redundant when Trooper Peters' testimony remains essentially uncontroverted. There also is no apparent reason why defendant could not have petitioned the court to leave the record open so *he* could obtain and introduce a copy of the videotape.

1053, 1056 (La. 2001) (citing, *State v. Inzina*, 728 So.2d 458, 466 (La. App. 2d Cir.12/9/98)); *see also United States v. Jones*, 185 F.3d 459 (5th Cir. 1999) (crossing "fog" line in Louisiana provides probable cause to support a stop); *contrast United States v. Miller*, 146 F.3d 274 (5th Cir. 1998) (alleged basis for the stop was not a violation of state law). Accordingly, Peters had reasonable suspicion to make the initial stop of Dantzler's vehicle.[16]

      b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions. *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437. "[T]he officer's questions need not even be related to the purpose of the traffic

---

[16] Furthermore, even in the absence of a traffic violation, the stop at issue was constitutionally permissible at its inception because the collective knowledge of all the officers involved gave rise to a reasonable suspicion that criminal activity might be afoot. *See United States v. Carmenate*, 344 Fed. Appx. 941 (5th Cir. Sept. 21, 2009) (unpubl.), *cert. denied by, Carmenate v. United States*, ___ U.S. ___, ___ S.Ct. ___, 2010 WL 753040 (Mar 29, 2010) (surveillance of truck revealed activity that suggested drug trafficking).

stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431. Detention during these actions is reasonable under the Fourth Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431 (citations omitted). "[T]o continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citation omitted). "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (citations omitted). Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted). Reasonable suspicion depends upon the "totality of the circumstances and the collective knowledge and experience of the officer or officers." *Id*.

Here, Trooper Peters was entitled to rely upon the collective knowledge of all the officers and deputies involved in the investigation of Dantzler and his vehicle. *United States v. Hernandez*, 477 F.3d 210, 215 n13 (5th Cir. 2007) (citation omitted). As such, he knew that Dantzler had been implicated in drug trafficking in the Bastrop area, that Dantzler had prior drug arrests, that a reliable confidential informant had indicated that Dantzler would be transporting

cocaine to the Morehouse Parish area, and that Dantzler had recently rented the 2009 Tahoe in Houston, Texas. *See* discussion, *supra*.[17] The cumulative effect of these factors provided Trooper Peters with reasonable suspicion sufficient to extend the stop. *See United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992) (reliable informant may provide reasonable suspicion).

**III.   The Search**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991). One such exception that is "specifically established and well-delineated" is the so-called automobile exception. *United States v. Ross*, 456 U.S. 798, 825 (1982). "The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'"

---

[17] "Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts." *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (citation omitted). Trooper Crooks was aware of these facts, *see e.g.* Tr. 28-30; also, he communicated with Trooper Peters prior to the traffic stop. (Crooks Report, Exh. 4-D).

*Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).  "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.

"Probable cause to search an automobile exists where 'trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband.' " *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc)).  The collective knowledge doctrine, discussed above, can also provide the probable cause necessary for the automobile exception to apply.  *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir. 1987) (citing *United States v. Mendoza*, 722 F.2d 96, 100 (5th Cir.1983) ("if . . . police officers, through their collective knowledge, had probable cause to believe that contraband was contained in [the] vehicle, their warrantless search . . . was lawful.")).  In determining whether probable cause exists, "each individual layer of information is not to be weighed.  Rather the 'laminated total' of the facts available is the source of the justification for a vehicle search." *Castelo*, 415 F.3d at 412 (citing *Edwards*, 577 F.2d at 885).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

As discussed above, Trooper Peters asked Dantzler for permission to search his vehicle. In response, Dantzler confessed that the vehicle contained ecstasy – an illegal drug.  Defendant's

admission provided Peters with probable cause to search the Tahoe, including the nylon bag that held the cocaine and firearm.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 17] filed by defendant Riley D. Dantzler be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 16th day of June 2010.

_____
Karen L. Hayes
U.S. Magistrate Judge